Pearson, C. J.
 

 Conceding that the deed of Mrs. Wellborn did not take effect by reason of the defect in the mode of taking her privy examination, and that the title was regularly deduced from the original grantee, down to Hugh Montgomery, and that, as between those claiming under him, it vested in her, see
 
 Winkler
 
 v.
 
 Gray,
 
 4 Jones’ Eq. 308, this Court concurs with his Honor in the Court below, that the plaintiff was not entitled to recover.
 

 We put our conclusion on two grounds;
 

 
 *233
 
 1st. The commissioners got
 
 the
 
 title, as well as the possession from Mary Gordon, and of course the defendant has a ■right to set it up.
 

 In 1791, Mary Gordon, who was then living on the land, bought it at sheriff’s sale, and a deed was executed to her.— This gave her color of title. She continued in possession under this deed, claiming adversely, and without interruption from 1791 to 1S00. This ripened her color of title, and she became the owner of the laud so held in possession by'force of the statute, unless there was some ground which prevented its operation. Two were relied on in the argument; but we think neither is tenable, viz :
 

 Mrs. Wellborn married in 1794, was then under age, and afterwards continued under coverture until shortly before this action was commenced. If we put out of view the term of five hundred years, created by Montgomery, and suppose the entire estate to have vested in Brown and others, in trust for Mrs. Wellborn, by force of the deed and will of Montgomery, in 1779, it is clear, that the nonage and coverture of the
 
 cestui qui. trust,
 
 could not have had .the effect of preventing the possession of Mary Gordon from ripening her title, and and defeating the title of the trustees, by tolling their right of entry, after which, certainly, the
 
 cestiti qui trust
 
 could not have had any remedy at law, and none in equity, save to hold her trustees accountable for a breach of duty in permitting the title to be divested by reason of
 
 laches
 
 on their part.
 

 Or, if we suppose Montgomery to have executed a mortgage in fee, and then to have assigned his equity of redemption in trust for Mrs. Wellborn, it is clear her nonage and coverture could not have had the effect of preventing the possession of Mary Gordon from ripening her title and divesting the title of the mortgagee by tolling his right of entry; after which, neither the trustees nor Mrs. Wellborn, could have had any remedy in law or Equity against Mary Gordon; for she would, by force of the statute, have acquired a title, not
 
 under
 
 the mortgagee,
 
 butpwrammmt
 
 and above all of them.— So that, if the mortgage-money had then been paid, and the
 
 *234
 
 mortgagee had reconveyed to the trustees, her right would ■not have been affected; for the mortgagee having lost the title, had nothing to convey, and could not by a naked deed, put the trustees in a better condition than he was in himself. Mrs. Wellborn’s title, therefore, if she has any, must depend on the fact that the mortgage was for a term of years.
 

 If one create a particular estate, say for life or years, and the estate of the particular tenant be divested, and his right of entry tolled by an adverse possession for seven years, under color of title, after the termination of the particular estate, the reversioner will have a right to enter by force of his original estate, because his right of entry did not accrue until the particular estate determined, and the statute did not begin ■to run as against him, before his right of entry accrued, and it is clear that after the entry of the particular tenant was tolled, he could not, by a surrender of his estate put the reversioner in a better condition than he was in himself; for he had no estate to surrender, and consequently, the reversioner would have no right of entry until he acquired one by force of his original estate.
 

 Nor is the case varied by the fact that the particular estate is a term for years, created by way of mortgage; for, after the mortgagee has lost his estate, he has nothing to surrender, and the mortgagor, if he redeems, must wait until his right of entry accrues by force of his reversion. These conclusions are all plainly deducible from familiar principles of the common law, and we presume no authority need be cited in support of them.
 

 Mrs. Wellborn’s nonage and coverture being of no avail, the other ground relied on to prevent the effect of the adverse possession of Mary Gordon, was the pendency of a suit in Equity between the mortgagees and the trustees and the
 
 cestui qui
 
 trusts, and one Lenoir, Lovelace, and Mary Gordon and others, instituted in the year 1794 for a settlement of all the litigation growing out of the non-payment of the mortgage-money, and adverse claims set up under junior grants, in which a decree was made in 1814, under which, one
 
 *235
 
 tract of land was sold to pay the balance due of the original purchase-money for which the mortgage was executed, and the mortgagee was decreed to assign the mortgage-term to Mrs. Wellborn, and Lenoir, Lovelace and Mary Gordon and others, were decreed to release and surrender all claim derived under the junior grants.
 

 This would be a complete answer to the statute of limitations, but for the fact that in 1800 the piece of land now in controversy, being a part Iff one of the larger tracts was withdrawn from the operation of the proceedings in Equity above referred to, because it was supposed that by the deeds of Wellborn and wife, Mary Gordon and the trustees of the University and others, the title to this particular parcel had become vested, both in Law and Equity, in the commissioners, as the site of the town of Wilkesboro’, and all the various conflicting titles having, as it was supposed, centered in them, the suit was discontinued in respect to this land, and it is not embraced in any of the subsequent orders, or in the final decree. So, as to it, the case is the same as if such proceedings had never been instituted.
 

 There is, consequently, nothing to prevent the title of Mary Gordon from having ripened into the better title, and Mrs. Wellborn has no cause of action. Iiow it may be after the expiration of the five hundred years, we will not venture to speculate, further than we have been forced to do, in order to establish our conclusion.
 

 2ndly. The deed of Wellborn and wife, as we have seen above, did not take effect as to her. Nor did it operate at the date of its execution in 1800, to pass any estate from Well-born; for he then had no interest in the land. He was married 1794, and had issue born alive, but he did not become tenant by the
 
 curtesy initiate
 
 in the trust estate of his wife ; for, in order to that, there must be an actual seizin in regard to a legal estate, or something equivalent to it in regard to a trust, which wras prevented by the adverse possession of Mary Gordon. So, the deed of Wellborn operated by way of estoppel, and afterwards, in 1814, when the term of five hun
 
 *236
 
 drecl years was assigned to Mrs. Wellborn, it passed to him,
 
 jw'6
 
 maribi, and then passed to the commissioners, or those claiming under them “to feed the estoppel” in the quaint language of the books, and the legal effect was to vest the title in the commissioners, or those claiming under them, in the same way as if he had been the owner of the term, when he executed the deed. This is a well settled rule of law, and is an instance of that being done, by mere act of law, which the party had before professed to do by a solemn act;
 
 Foscue
 
 v.
 
 Satterwhite,
 
 2 Ired. Rep. 470;
 
 McNeely v.
 
 Hart, 9 Ired. Rep. 61; 2 Smith’s Lead. Oases, 460, (notes.)
 

 To meet this view of the case, the counsel for the plaintiff again relied on two grounds, viz: Where the deed sets out
 

 the fact that the party has no estate, and professes to pass only such interest as he may own, there is no estoppel; for, as the books say “an estoppel against an estoppel leaveth the matter at large;” as if the deed sets out that the party is entitled to a contingent interest, which is not the subject of a conveyance, and professes to pass it, there is no estoppel, and and should the interest afterwards vest, it will not pass — under the rale as to feeding an estoppel; but it is necessary for the purchaser to apply to a Court of Equity in order to get an assignment, under the allegation that the deed is evidence of an
 
 executory agreement
 
 to convey, of which Equity will decree specific performance.
 

 This position is true, and for the purpose of showing its application to the present case, the learned counsel insisted that Wellborn’s deed sets out a mere trust estate, and professes only to pass the equitable estate of himself and wife. So, the question turns upon the construction of that deed. We think it does profess to pass the
 
 legal title in fee simple■
 
 — -that is, the land itself, and not a mere trust estate. It recites that
 
 Oossart
 
 had conveyed the land in 1778, to Montgomery, and that he, in 1779, conveyed the land to Brown and others
 
 in trust
 
 for his two infant daughters, Rebecca and Rachel — and the marriages of the said Rebecca and Rachel with Wellborn and Stokes, and that the commissioners are empowered to
 
 *237
 
 purchase fifty acres of land for the site of the public buildings for Wilkes county, but is silent in respect to whether the trustees, Brown and others, had conveyed the legal title to the
 
 cestuis qui trust.
 
 Rebecca and Rachel, and by its silence, leaves it to be inferred that they had so conveyed, for it then professes to “give, grant, bargain and sell,alien and confirm” to the commissioners, a certain piece or parcel of land, bounded, &c., containing fifty acres, to have and to hold the said fifty acres of land to the commissioners, and to their only use and behoof, to them, their heirs and assigns forever; with warranty against themselves and their heirs, and all persons claiming under Montgomery — in short, it conveys in the usual form, the legal title in the land itself, as if they had legal title, by a previous conveyance, from the trustees.; consequently, the deed operated by way of estoppel.
 

 But in the second place, it was insisted, that as Wellborn acquired the term of 500 years
 
 jure
 
 ma/riti, and liis wife would take it by survivorship, in the event of his death, without making a disposition of it, the law will not dispose of it for the purpose of feeding the estoppel, and thereby deprive the wife of her chance of survivorship.
 

 No authority was found to support this distinction between a case, where a husband buys' a term for years, and where it is acquired
 
 jure
 
 mariti, and it is opposed to principle ; for when he afterwards acquires the estate, no matter how, provided he does not hold it in
 
 a/utre
 
 droit, as where it devolved upon the wife, as executrix, the law, in its justice, will pass it to the party to whom he had professed to convey the land ; in like manner, as if he had owned it- at the time he made the deed. This is decided in
 
 Doe
 
 v. Oliver, reported in 2 Smith’s leading cases, 417, where the authorities are collected. The Court say: “We are satisfied, upon the authorities, that a fine, by a contingent remainderman, though it operates by estoppel, does not operate by estoppel only, but has an ulterior operation when the contingency happens, and that the estate, which then becomes vested, feeds the estoppel, and that the fine operates upon that estate, as though that estate
 
 *238
 

 had been vested in the eonusees
 
 at the time the fine was levied.”
 

 The cases referred to, show that there is no difference in the operation of a fine and a deed, in this respect, and the conclusion is, that the law does that for the part}’’, which he ought to do himself, that is — transfers the estate, the instant he acquires it, and has the right of disposition.
 

 If Mrs. Wellborn had acquired the legal estate in the reversion, before the term was assigned to her, a very interesting question would have been presented, i. e., would the term have instantly
 
 merged
 
 so as to give her the fee simple in possession ? Or would it have passed to her husband
 
 jure
 
 mariti, and instantly passed to feed the estoppel ? Both the
 
 merger
 
 and
 
 thq feeding of the estoppel
 
 being acts of law. However, the question does not arise, as the surviving trustee did not conve3>-to her until some years afterwards, and it is alluded to merely because it was suggested on the argument.
 

 Per Curiam,
 

 Judgment affirmed.